BLACKMAN (VON ROY v.). See Case No. 16,997.

BLACKMER (MACDONALD v.). See Cases Nos. 8,757, 8,758.

BLACK RIVER INS. CO. (SIMONDS v.). See Case No. 12,874.

---

## Case No. 1,473.

### The BLACKSTONE.

[1 Lowell, 485.][1]

District Court, D. Massachusetts. Nov. Term, 1870.

COLLISION — BETWEEN STEAM AND SAIL—EXPERT TESTIMONY —FOG — RATE OF SPEED — HOLDING COURSE.

1. In a collision cause, experts may testify concerning the bearing of a steamer's rate of speed upon her navigation, such as the facility of steering, &c., but not to the prudence or propriety of keeping up a high rate of speed in a fog.

[See The Clement, Case No. 2,879; The Aleppo, Id. 157; The City of Washington, 92 U. S. 31.]

2. A steamer was running at her usual speed of more than eight knots in a dense fog in the South Vineyard channel, and too fast to avoid a schooner after she was seen; held, the steamer was not going at a moderate speed as required by the statute.

[Cited in The Hansa, Case No. 6,037; The City of Panama, Id. 2,764; The Pennsylvania, 12 Fed. 917; The Rhode Island, 17 Fed. 558; The State of Alabama, Id. 853; Clare v. Providence & S. S. Co., 20 Fed. 536; The Nacoochee, 28 Fed. 467.]

3. A schooner was held not to be in fault for tacking and running back on her course in a dense fog, though a collision with a steamer took place which would not otherwise have happened, it being proved that the collision was not a necessary or probable consequence of the act, the schooner being more than four miles from the steamer when the change of course was made.

4. The schooner having the general duty to keep her course after the steamer was discovered; held, she was in no fault for doing so, when she heard no hail from the steamer to change it, it not being entirely and unmistakably certain that a change would be calculated to aid the steamer to avoid the collision.

In admiralty. Collision.—The schooner S. H. Woodbury, coal laden, came in collision with the large screw steamer Blackstone of the Merchants' Line, between Boston and New York, and was sunk and totally lost at about two o'clock in the afternoon of the twenty-ninth of July last. The vessels were both bound towards Boston, and were passing through the passage called in the answer the South Vineyard channel, approaching the Cross Rip light-ship from the direction of Martha's Vineyard, the schooner going with a fair wind nearly as fast as the steamer and about four miles ahead of her, when the schooner ran into a bank of fog, and her master thought it more prudent to come to

[1] [Reported by Hon. John Lowell, LL. D., District Judge, and here reprinted by permission.]

anchor, and for this purpose he tacked and stood back on the wind, close hauled on the port tack, intending to beat up to one side of the channel and come to anchor. After running so for some minutes he heard the whistle of the steamer, and immediately ordered his fog-horn to be sounded, which was done several times. After a few minutes more the steamer was seen, and was hailed to keep out of the way, but did not appear to change her course, and ran into the schooner near her bows, cutting her down and sinking her almost instantly. The crew had time to get into their own boat, and were picked up by the steamer. On the part of the steamer, the evidence was that when the fog shut in, the master clewed up his gaff-topsail, leaving the foresail, staysail, and jib set upon the foremast, placed the second mate and two men upon the watch, and sounded the steam-whistle at short intervals. He had seen only two vessels ahead of him, one of which was this schooner, and both were going in the same direction with his own vessel. He continued in the same course and at about the same speed as before, a speed which witnesses on both sides estimated at about eight knots an hour, against a tide of two or two and a half knots. To support this estimate it was proved that the Blackstone is a heavy boat, slow for her size, with small engines, and that she had a kind of coal which was not well suited to her boilers. On the other hand, the libellants showed from Captain Loveland's log-book that he had passed certain points on the Vineyard at certain times, from which the computation was made that he was going more than eight knots over the ground, and therefore nearly or quite eleven knots through the water.

J. C. Dodge, for libellants.
D. Thaxter & F. Bartlett, for claimants.

LOWELL, District Judge. Every steamer is required by the statute to go at a moderate speed in a fog, and the only real dispute on this part of the case is, whether this requirement was followed. For it is not denied that after the schooner was discovered, every thing was done that could be done, and with all diligence, to avoid her, and to stop and back the steamer; and that it was then impossible to prevent the catastrophe. Nor is the sufficiency of the lookout brought into question. I refused to receive the opinions of experts upon the prudence of the master in keeping his steamer at this speed, excepting so far as any question of navigation, such as convenience of steering, &c., was concerned, because, when all the facts are shown, and their bearing upon navigation is explained, the question whether the speed was moderate, whether called fact or law, is not one of nautical skill at all, but of sound judgment, which the expert is no more competent to speak to than any one else.

The argument for the steamer is, that there was no occasion to slacken her speed, because the fog appeared to be local, a small bank which would soon be passed, and that her officers could see, before it covered them, that there was nothing in the way for several miles; that they had a right to expect the schooner to keep her course, and that if she had done so, there would have been no collision. Besides this, they offered evidence tending to show that the vessels were so near when the horn was first heard, that nothing could have saved the schooner, however slowly the steamer might have been moving. And this evidence was not contradicted. The moderate speed which the statute prescribes is thus spoken of by Judge Shepley, in giving the opinion of the circuit court in the late case of The Monticello [Case No. 9,738]. The term, he says, "is not capable of any definition which would apply to a speed of any given number of miles an hour alike under all circumstances. What would be a moderate speed in the open sea, would not be allowable in a crowded thoroughfare or in a narrow channel. And under the same circumstances in other respects, the speed should be the more moderate according as the fog is more dense. The only rule to be extracted from the statute and a comparison of the decided cases is, that the duty of going at a moderate speed in a fog, requires a speed sufficiently moderate to enable the steamer, under ordinary circumstances, seasonably, usefully, and effectually to do the three things required of her in the same clause of the statute, viz., to slacken her speed, or, if necessary, to stop and reverse." And he cites, among others, the case of The Batavier, 9 Moore, P. C. 286, in which the court thought it unnecessary to ascertain the precise rate of speed of the steamer, the witnesses having stated it all the way from ten knots to one and a half, because, they said that any rate was too great that endangered other vessels in the river. There is another case in which the same learned body, the privy council, is said to have decided that if the steamer was navigated at a rate which made it impossible for her to avoid collision with a ship, "discovering it only at the distance at which alone it could be discovered, that it followed as an inevitable consequence that she was sailing at a rate of speed at which it was not lawful for her to navigate." The Europa, 1 Pritch. Adm. Dig. 187. This seems to make the fact of the collision the conclusive test of negligence in all cases in which the sailing vessel is in no fault. It is not difficult to find cases in which various rates of speed have been held to be too great, in two of which the rate was from three and a half to five miles (The A. Rossiter [Case No. 17,147]; The Robert and Ann v. The Lloyds, Holt, Rule of the Road, 58); and in several it was less than the rate here; but each case must depend on its particular circumstances. The decisions only prove that

there is scarcely any speed that has not been held to be too great upon some state of facts. The evidence is that the fog was very dense while it lasted, and that the channel is much frequented, so that the steamer was placed in the circumstances in which all the authorities require great caution and circumspection to be exercised. To break the force of these circumstances, it is said that neither the general character of the thoroughfare, nor the thickness of the fog imposed any special duty upon the steamer, because her master in fact saw that there was no danger to be apprehended in the channel at the time. This point meets us in both parts of the case, because it is set up as a fault in the libellants, and as an excuse for the claimants, that the schooner should have been put about in the midst of this fog, and have come back upon her former track. The collision is certainly an unfortunate result to have followed from a precaution intended to have a very different effect, but I cannot hold it to be a fault, because it was undertaken at such a distance from the steamer, that the collision or any danger of it, was not an obvious or probable consequence. The schooner was working out of the channel, and had got somewhat to the southward of the usual course of vessels; the master of the steamer says a few hundred yards, and other witnesses make it more. It is proved that she might have anchored, with good ground, on either side of the channel, and without putting back, but her master thought it more prudent to run back to the widest part of the channel. As this decision was taken when the steamer was some four miles off, I hold that the master of the schooner was free to change his course at that time without reference to the steamer. The master of the schooner had seen the steamer, but she was so distant that he was not sure which way she was going. If the schooner had the right to run back in the general direction in which the steamer was coming, she had the right to expect care on the part of the steamer, if they should happen to meet fifteen or twenty minutes afterwards. It is undoubtedly true that the master of the steamer was surprised to meet this particular schooner, as his first exclamation clearly showed. Still, in running through the channel at his usual speed, he took the risk of meeting this or any other vessel properly navigating these waters; and it is nothing to him whether the schooner turned back for a more or less valid reason, seeing that she did it under circumstances which ought to have made it reasonably safe. If she were putting back to port from absolute necessity the decision of this case ought to be the same as it should be under the existing circumstances.

I do not place much reliance upon the evidence, though not contradicted, that a slower speed would have made no difference. It was well suggested, at the argument, that

it might, at least, have enabled the lookout to hear the fog-horn sooner, because the noise at the steamer's bow would have been less; and it is by no means clear that it would not have enabled the steamer to avoid the libellant's vessel after she was seen. Even an expert must speak very cautiously to such a question, which involves a very close calculation of what a steamer can do in a given time, because no one is in the habit of timing them exactly, and a difference of a few seconds changes the whole aspect of the question. The statute undoubtedly assumes with a binding force which I have no right to resist, that a slow speed conduces to safety, and there is nothing in this case that should take it out of the rule, unless it be that the fog was unusually dense, or the steamer particularly difficult to manage; in either of which cases, the necessity for caution was all the greater. I should be glad to see the experiment tried by a steamer, of moderating her speed in a fog, but I have hitherto found that their managers do not consider it to be important. If it is not, they should procure a change of the law. Notwithstanding sailing vessels are not specially mentioned in this connection in the statute, I suppose they are still bound by the general rules of navigation, and might, under some circumstances, be held to have carried too much sail in a fog. Such fault is not charged in this case; but it is said the schooner should have luffed. Undoubtedly, if she had heard the hail, she might well have obeyed it, because the steamer could not then have objected, and the consequences might have been very useful. But her duty being to keep her course, I should be very slow to charge her with wrong in adhering to this rule, in the absence of orders from the steamer, although a wise audacity might have prompted a departure from it. The steamer was the master of the navigation, if I may so express it, and might go to port or to starboard, and though, under the particular circumstances, any competent seaman would perhaps have starboarded, yet if the schooner had changed her course upon the faith of this presumption, she could scarcely have been cleared of responsibility, if the steamer had ported, and the collision had occurred, unless the change had taken place so near the very moment of collision, that it seemed a precaution to lessen the shock rather than a manoeuvre to avoid the collision altogether. At all events, she would have been put upon the defensive by her violation of the letter of the law. Upon the whole case, I find that the steamer disobeyed the law by going at her usual speed, which I believe to be nearer eleven knots than eight; and that the schooner was not in fault. Decree for the libellants.

BLACKSTONE (DE VISSER v.). See Case No. 3,840.

BLACKSTONE CANAL CO. (FARNUM v.). See Case No. 4,675.