## THE STATE OF ALABAMA.

### (*District Court, S. D. New York.*   September 7, 1883.)

1. **ADMIRALTY—COLLISION—RULE 21—MODERATE SPEED—FOG.**

    The moderate speed required of steamers in a fog by rule 21, is something materially less than the vessel's ordinary full speed; it has reference to all the circumstances affecting the steamer's ability to keep out of the way, including her own power in backing, and requires a *reduction* of speed according to the density of the fog.   Whenever the fog is sufficient to increase materially the dangers of navigation, a given speed may be moderate for a swift vessel, which would be excessive for a slow one having less power to stop and back quickly.

2. **SAME—PROMPT BACKING.**

    Where there is danger of collision, prompt backing, as well as stopping the engines, is incumbent on the steamer, and any delay in ordering the engines reversed is at her risk.

3. **SAME—MISTAKE OF SAILS—ERROR OF JUDGMENT.**

    An erroneous order to change the helm, owing to the lookout's mistaking the main try-sail for the head-sails when first dimly seen through the fog, the mistake being corrected as soon as it could be perceived, *held*, error of judgment and not a fault,

4. **SAME—OVERTAKING VESSEL.**

    An overtaking vessel is one coming up astern of the proper range of the leading vessel's colored side-lights; *i. e.*, more than two points aft of abeam.

5. **SAME—FLASH-LIGHT—REV. ST. § 4234.**

    The American law (section 4234, Rev. St.) requiring a flash-light to be exhibited to an overtaking vessel is not applicable, as the law of the forum, to a collision between vessels belonging to two different foreign nationalities, neither of which requires such a light, according to its own maritime law.

6. **SAME—LIGHT—ENGLISH LAW.**

    No stern-light or flash-light was formerly required by the English regulations; and the maritime law, as construed by the English courts previous to the new rules of 1880, did not make the exhibition of such a light indispensable, but only one of various signals which might be adopted by the leading vessel to warn an overtaking vessel of her whereabouts.   *Semble,* the French law is similar.

7. **SAME—SIGNALS BY HORNS SUFFICIENT.**

    Where a fog was such that a steamer used her fog-whistles, and a brig her fog-horn, *held*, the latter's blowing three fog-horns continuously from the time the steamer was observed, was a sufficient compliance with the former English and French maritime law as a signal to an overtaking steamer, if the latter were in fact astern of the range of the brig's lights.

8. **SAME—CHANGE OF COURSE IN EXTREMIS.**

    Where a brig luffed less than half a minute before a collision, which seemed to be instantly impending amidships, in order to save her small boats, *held*, a change *in extremis*, and not a fault, though the change was useless and erroneous.

9. **SAME—EVIDENCE—CREDIBILITY OF WITNESS.**

    Where the great preponderance of testimony showed the mode and conditions of the collision to be such that the steamer could not have been astern of the range of the brig's red light, if properly set and burning, and no red light was seen by an alert lookout on the steamer, or by her officers, who were all watching the brig, and a change of helm was made by the steamer upon a mistake of the brig's course, which mistake could not have been made had the red light been seen, and the evidence being also unsatisfactory as to the trimming and proper adjustment of the brig's colored lights, no screens being used, but the poop-rail used instead, *held*, that though most of the brig's witnesses testified that the red light was burning brightly, superior credit should be given to the steamer's witnesses that no red light was visible, and the brig was held in fault.

**10. SAME—CASE STATED.**

Where a collision occurred between the English steamer State of A. and the French brig M. & G., on the high seas, about 30 miles east of the Grand Bank, on a night which was foggy or hazy below, and bright moonlight above, and the steamer was previously going W. S. W., about eight and one-half knots, her ordinary full speed, and the brig about one or one and one-half knots, on a course from S. to S. W., close-hauled and by the wind, which was variable, both vessels previously using their fog signals; and the brig, on discovering the steamer's white and green lights somewhat aft of abeam, about three or four minutes before the collison, set three horns a blowing and rang the bell, but showed no stern or flash light; and the steamer, from two to three minutes before the collision, having observed the dark loom of the brig nearly ahead on her starboard bow, but seeing no light, at once ordered her helm hard a-port and engines stopped, and afterwards, when the brig's sails first became indistinctly visible, about one-half or three-fourths of a minute before collision, ordered her helm to starboard, through the brig's main try-sail being mistaken for the head-sails, but corrected the error by the time the helm had run amidships, and again put the helm hard a-port, and at the same time ordered her engines full speed astern, and the brig luffed at about the same time, changing two points to westward, and the collision happened about a half minute after, by the steamer's striking the brig nearly at right angles, about nine feet from her stern, and the brig was sunk,—*held*, that the steamer was in fault for not having reduced her running speed in the fog, and also for not more promptly reversing her engines after the brig was discovered. *Held, also,* that the brig necessarily bore at least one and one-half points off the steamer's starboard bow when discovered, and could not have been sailing further west than S. by W. or S. S. W., and that her red light ought to have been seen on the steamer; that it was not seen through no fault on the steamer's part, but because it was either dim or improperly set; and that for this fault of the brig she could recover but half her damages.

In Admiralty.

*Coudert Bros.* and *Edward K. Jones,* for libelants.

*Evarts, Southmayd & Choate,* for claimants.

BROWN, J. The libel in this case was filed by the owners, master, and crew of the Marie & Gabrielle, a French brig of about 240 tons burden, to recover for the loss of the brig, the cargo, and the men's personal effects, through a collision with the State of Alabama, about 30 miles off the eastern end of the Grand Bank of Newfoundland, between 11 and 12 P. M. on the night of June 1, 1879. The port quarter of the brig was struck nearly at right angles either by the stem or the bluff of the bow of the steam-ship. A part of the brig's stern was carried away, including the rudder, and the brig was soon after abandoned by her master and crew, as in a sinking condition.

The brig was engaged in the cod fishery with a crew of 17 men, and was returning from the Grand Bank towards St. Pierre de Miquelon. On the evening of the collision there was a hazy fog low down upon the water, varying from time to time with denser drifts; but clear, with bright moonlight, above. The wind was very light from the westward, and variable; the sea was smooth, but with a heavy swell from the west. The brig was sailing by the wind, close-hauled, upon her starboard tack, on a general course of about S. S. W., but varying at times from S. to S. W., and making from a knot to a knot and a half per hour. During an hour or two preceding the collision her fog-horn had been blown every two or three minutes;

she had two seamen on the lookout forward, another amidships, and the mate, salter, and wheelsman on the poop. From three to five minutes before the collision, the white and green lights of the steamer were seen somewhat aft of abeam, on the port side, making apparently for about amidships of the brig. Immediately those on the brig set three horns blowing continuously, and rang the bell, to which, as the steamer approached, shouts and calls were added. The noise and confusion aroused the watch below, bringing nearly all of them on deck, as well as the captain, who was reading in the cabin. He came on deck some three minutes before the collision; immediately saw the steamer's white and green lights about abeam, and nearly in line, as he says; from which he judged the steamer was coming towards him nearly end on. All say they did not see her red light before the collision.

Shortly before the collision, and to prevent, as the captain says, the steamer from striking amidships and smashing his small boats, he ordered the helm hard a-port, causing the brig to luff a few points, (*quelques quarts*,) or one or two points, to the westward, and her sails to shake. Two other of her witnesses say she luffed two points. The steamer soon after struck the brig nearly perpendicularly, says the captain, on the port quarter, about nine feet from the stern, cutting off and carrying away her stern, from a point about nine feet from the taffrail, on the port side, obliquely across to about one foot from the taffrail on the starboard side, and extending down to within about a foot of the water line. The red side light, which was placed six feet from the stern, and the rudder were carried away, and the wheel demolished; the rear of the cabin was in part laid open; and the vessel soon made water so rapidly, and took such a list to port, that she was believed to be in a sinking condition and was abandoned by the captain and crew. The latter took to their small boats, with which they reached the steamer that lay by at some distance in the fog. Before leaving her the captain had tried to bring the brig to; but he was unable to do so through the loss of the rudder, and she went off to the south-eastward in the fog, under all sail, and has not since been reported.

The State of Alabama is a British iron steamer of about 2,000 tons burden, and 350 feet long. At the time of the collision she was making one of her regular trips from Glasgow to New York, upon a course of W. S. W., and going from 8 to $8\frac{1}{2}$ knots an hour, and was in charge of the first officer. During the afternoon, her witnesses say, it was somewhat hazy, with increasing fog in the evening; and from 6 P. M. the fog-whistle was blown at intervals. Towards the time of the collision the testimony is that the fog-whistle was blown every two or three minutes. No whistle, however, was heard by those on board the brig till after the collision; nor were the horns or bell or shouts on the brig heard by those on board the steamer until they

were within 100 yards of the brig, too late to be of any service. There were two able seamen on the lookout, close to the stem of the steamer. One disappeared soon after arrival, and his testimony could not be obtained. The other, O'Neill, who was on the starboard side, testified that the brig was first indistinctly observed by him through the fog about a point or half a point on the starboard bow; that no light upon the brig was visible, and that he so reported in answer to the inquiry of the first officer. The latter, inferring from this that he was following the brig astern and out of range of her lights, at once ordered the helm hard a-port and the engines stopped. These orders were immediately obeyed, 30 to 40 seconds being required, according to the testimony, to get the helm hard over.

About a minute afterwards, as the sails of the brig came dimly into view, the lookout mistook her main try-sail for her head-sail, and supposing from this that the brig was going northwards, sung out, "Hard a-starboard, or we'll be into her." The order to starboard was given instantly; but in a few seconds, according to the testimony of the steamer's witnesses, and by the time the helm had run amidships, and before it had gone to starboard at all, the first officer, having been able by the use of his glass to see the sails distinctly enough to correct the mistake, countermanded the order, and the wheel was again put hard a-port as quickly as possible, and so remained until the collision, which was within about a half minute after. At the time the last order to port was given, and not before, the engines were ordered and put full speed astern. The first officer testifies that when he thus made out the sails distinctly, the brig seemed to be directly ahead, going southward, at right angles to the steamer, and that the steamer had then veered about two points under her port wheel. This change of two points would have brought the steamer heading due west. The quartermaster thought that up to the time of the collision the steamer had veered two to three points, but he did not look at the compass; the first officer says that as they passed the brig the steamer headed W. N. W., which would be a change up to that time of four points in the steamer's course. This officer was 100 feet from the bows, and the effect of the collision and going this distance would probably deflect the steamer's head at least half a point, so that $3\frac{1}{2}$ points would seem from the steamer's evidence to be the outside limit of change in her course up to the moment of collision.

The steamer's witnesses testify that the brig was struck only by the bluff of the steamer's port bow, about 25 or 30 feet from the stem, where a streak of green paint two to three feet long was found rubbed upon the steamer's black paint,—the only mark of the collision which the latter exhibited. The position of the two witnesses who testify to this was not well suited for observing accurately, and the officers were so far from the bow as not to be able to observe the blow at all. The united testimony of the witnesses on the brig, that the latter was

struck on her port quarter about nine feet from her stern by the stem of the steamer, is, I think, more probably correct.

The libelant's counsel contends that the steamer's speed was unchecked, or nearly so, at the time of the collision. But there is no evidence to sustain this. The entry in the engineer's log gives the same moment, 11:45, for the "stop-bell," and "engine full speed astern." This shows upon its face that the entry was not made with exactness, since "full speed astern" could not be got till some considerable part of a minute at least after the stop-bell. The entry was not the original entry, and the assistant who made it was not a witness. The testimony of the first officer, of the quartermaster and others must, therefore, be accepted, showing that the engines were ordered stopped when the first order to port was given, and that the order was obeyed. From that time the steamer was diminishing her speed for nearly two minutes, when she was put full speed astern, nearly a half-minute before the collision, which must, altogether, have reduced her speed one-half. Had not her speed been thus reduced, and had not the stem struck the brig nearly at right angles, or at least not more than a point forward of a right angle, the brig must, I think, have been run over and cut through to the water-line, instead of her stern being shoved to starboard, allowing the steamer to pass astern, with only the smashing obliquely of the brig's port corner.

Upon these facts three principal faults are alleged against the steamer: (1) Going at too great speed in the fog; (2) not reversing at once on discovering the brig; (3) incompetence and carelessness in navigation in giving contrary orders to port, to starboard, etc., when either one, properly adhered to, would have avoided the brig.

The respondents deny any fault in the steamer, and contend that the collision is chargeable solely to the fault of the brig: (1) In showing no stern light to warn the steamer in time; (2) in luffing and coming into the wind, so as to check her own speed, whereas otherwise she would have gone clear; (3) insufficient or improperly set regulation lights.

1. As to the speed of the steamer. The abstract from the steamer's log states her speed at eight and a half knots. The patent log was hove 15 minutes before the collision, and the testimony is that this showed seven and three-quarters knots only. The engineer's log, with hourly entries, shows all the conditions affecting the speed to have remained the same from 1 P. M. down to the time when the engines were stopped, a few minutes before the collision, and that the average speed was eight knots. From eight to eight and a half knots may, therefore, be taken as her rate of speed at this time.

There is no direct and satisfactory testimony as to the steamer's ordinary full speed. The individual statement of one witness on cross-examination mentions 10 knots as her full speed; but whether that refers to favorable conditions of wind and sea, or not, does not appear. At this time the steamer had a light wind and a heavy swell

ahead. The first officer testified that usually in a fog the captain ordered the engineer to "stand by," *i. e.*, to diminish the pressure, which would reduce the speed; and he supposed that had been done in this case. But the engineer's log shows no reduction of pressure or speed after 1 P. M. preceding; and the captain and engineer, though both of them were witnesses, do not testify to any order to "stand by," or to reduce speed, during that night or afternoon. If the steamer was going at reduced speed the burden lay on her to show that fact in her own justification; and she could doubtless have done so by some direct and proper evidence. As none such was offered on her part, and in view of the foregoing circumstances also, I must assume that there was no reduction, but that the steamer was going at her ordinary full speed, which, under the existing circumstances, was about eight or eight and a half knots per hour.

The failure to slacken speed in this fog must be set down as one fault in the steamer. Although the fog was not dense, it was nevertheless evidently such a fog as materially to interfere with the timely observation of other vessels, and therefore increased materially the dangers of navigation. To go at full speed in such a fog is not a compliance with rule 21, which requires steamers in a fog to go at moderate speed.

Moderate speed, as often stated, is not a fixed rate for all vessels or for all occasions. It has reference to all the circumstances which affect the ability of the steamer to keep out of the way; not merely, therefore, to the circumstances external to the ship, but also to the power and ordinary full speed of the steamer herself; because a fast vessel with powerful engines can be handled more quickly, stop sooner, back faster, and get out of the way quicker, going at a given rate, than a steamer of less power going at the same rate. Eight knots might, therefore, be a moderate speed for a steamer whose ordinary rate was fifteen knots, and not at all moderate for another whose maximum speed was but eight. The evident design of rule 21 is to make a steamer's means of quickly avoiding danger the greater in proportion as the means of an early discovery of the danger are diminished. Slower speed must make compensation for the greater risk of collision. No steamer's speed is moderate in the sense of rule 21 so long as she is going at her ordinary full speed. She is required to moderate and reduce her speed according to the density of the fog and the increased difficulty of discovering danger, and of adopting timely means to avoid it. In *The Pennsylvania,* 19 Wall. 125, the court say: "The purpose of this requirement being to guard against collision, very plainly the speed should be *reduced* as the risk of meeting vessels is increased." Pages 133–4. In *The City of New York,* 15 FED. REP. 628, this court held that the moderate speed required by rule 21 is something materially less than the steamer's ordinary full speed which is allowable when there is nothing to increase the ordinary risks of navigation.

The burden of proof was upon the steamer to show compliance with this rule. She has not done so. In several cases a less speed than eight knots has been held excessive. *The Pennsylvania*, 19 Wall. 125; 23 Law T. (N. S.) 55; *The Monticello*, 1 Holmes, 7; *The Blackstone*, 1 Low. 485; *The Hansa*, 5 Ben. 501; *The Java*, 6 Ben. 245; *The Pottsville*, 12 FED. REP. 631. But these were in cases of dense fog. In the case of *The Oder, infra,* 11 or 12 knots was held not excessive; but that was not a case of fog at all. Without determining whether 8 or $8\frac{1}{2}$ knots would or would not be a moderate rate for vessels of much higher ordinary speed in so light a fog as prevailed on the night of this collision, I must hold it not moderate for this steamer, because not moderated or reduced from her ordinary speed. This fault evidently contributed to the collision, since, if her speed had been less, the brig would plainly have gone clear.

2. The evidence on the part of the steamer, moreover, shows that she was in fault, also, for not more promptly reversing her engines. According to the testimony of the first officer and others, the order to reverse was not given until the steamer was within about 100 yards of the brig, about a half minute only before the collision. The brig had been reported some two minutes at least earlier, and the order was then given to stop the engines, but no order to reverse. The testimony of the engineer, and the entry by his assistant, who was not sworn, cannot prevail against the testimony of the other officers for the reasons previously stated.

The brig, when first reported, was, as I find, about $1\frac{1}{2}$ points on the steamer's starboard bow, and as her lights were not seen, the first officer rightly inferred that she was going to the southward. But in porting, the steamer was directed knowingly towards the brig's path; and though the first officer doubtless expected to go astern of the brig, his ability to do so depended entirely on her distance from him. In the night, in fog, and with no light seen, the distance was manifestly uncertain. There was, therefore, evident danger of collision from the moment the brig was reported and the helm put a-port, and the engines should have been reversed at once. The only reason, apparently, for not reversing them at once, was that the fog proved "deceptive," and the brig was supposed to be a half mile or more distant; much farther off than she really was. But it is impossible to hold an erroneous estimate of the distance of another vessel in a fog to justify delay in giving the orders necessary to avoid a collision, and which, if given, would effectually have avoided it. Rule 21 requires that the steamer "shall, if necessary, stop and reverse." That it was in this case necessary to reverse at once, as well as to stop, the result proved. When, as in this case, the danger of collision is evident, delay in reversing, like delay in adopting promptly and seasonably any other practicable means of averting peril, is at the risk of the steamer. No other rule can possibly consist with safety. *Nelson* v. *Leland*, 22 How. 48, 55; *The America*, 92 U. S. 432, 437; *The Grand*

*Republic*, 16 FED. REP. 424; *The Frankland*, L. R. 4 P. C. 529; *The Love Bird*, 6 Prob. Div. 83. On this additional ground, therefore, the steamer must also be held in fault.

3. The change of the helm under the temporary order to starboard does not seem to me to be proof of negligence, or of careless or incompetent navigation. The lookout was alert and active, as was necessary. When the brig first came dimly into view, the fog being lighter above, he mistook the brig's main try-sail for the head-sails,—a mistake which might naturally happen to the most careful and skillful seaman; the emergency called, or appeared to call, for instant action; and the order made would have been the proper and necessary one. The mistake was discovered as soon as it was discoverable, and at once corrected. Navigation must necessarily be according to observation at the time. The observations made in this case, both in the mistake and in the correction of it, were, so far as I can judge, as quick, active, and accurate as the circumstances at the moment admitted. The error was one of judgment in the interpretation of what dimly met the eye, and not, under the circumstances, evidence of either carelessness or incompetency. An analogous error as to the light, and porting thereon, in the case of *The Oder*, 13 FED. REP. 285, was held not to be imputed to the steamer as a fault.

It remains to be considered in what respects, if any, the brig was in fault.

1. Assuming that the steamer was coming up astern of the brig, and out of the range of her red light, the claimant contends that the brig was bound by the general maritime law to exhibit a stern or flash light to the steamer, to apprise the latter of the brig's proximity. The libelants contend that there was then no such maritime obligation, and that the brig gave all the signals required. There can be no doubt that the exhibition of such a stern light would have prevented this collision. The light could not have failed to be seen on the steamer much sooner than the dark looming of the brig through the haze, and more time and space to avoid the brig would have been had. Such a light would also have made known the course of the brig, so that the mistaken order to starboard would have been avoided. If, therefore, the exhibition of such a light was a strict obligation on the brig under the maritime law, then the absence of it in this case is clearly material. It is only where it is entirely clear that the exhibition of a light could have made no difference, and conveyed no additional or earlier information to the other vesel, that the failure to show a required light is held immaterial. *The Margaret*, 3 FED. REP. 870; *The Excelsior*, 12 FED. REP. 203, and cases there cited; *The Pennsylvania*, Id. 914; *The Narragansett*, 11 FED. REP. 918 and note; *The Breadalbane*, 7 Prob. Div. 186; *The Love Bird*, 6 Prob. Div. 83.

By the act of 1871 (Rev. St. § 4234) a flash-light is made obligatory, and this is part of our maritime law. But no such regulation was adopted by France or England, to which these two vessels

belong, until after this collision took place. By article 11 of the new international regulations, which went into effect September 1, 1880, (L. R. 4 Prob. Div. 246,) a white light, or a flare-up light, is for the first time required to be exhibited to an overtaking vessel; *i. e.*, a vessel coming up astern of the range of the regulation lights of the vessel ahead. *The Franconia*, L. R. 2 Adm. Div. 8.

If there were a diversity between the law of England and of France in respect to the exhibition of such a light, then, as neither vessel could claim the benefit of its own law exclusively, the law of this country, as the law of the forum, might possibly be applicable in the present suit. *The Scotland*, 105 U. S. 29–31; *The Sarmatian*, 2 FED. REP. 911.

Assuming that by the French law the exhibition of a stern light was not required, the English decisions seem to me to show clearly that by the maritime law, as understood and applied in England also, such a light was not strictly obligatory, but was at most regarded as only one of various different signals, which, under circumstances of manifest danger, the vessel ahead might be bound to give to an overtaking vessel which is astern of the range of the former's lights. The regulations of 1863, to which France and England were parties, provided (article 2) that no other lights than those mentioned in the articles should be carried; and those articles contained no provision for exhibiting a stern or flash-light to an overtaking vessel. The only allusion to a flash-light is in article 9, which provided that "fishing vessels and open boats shall not be prevented from using a flare-up light in addition if considered expedient." There was no evidence that it was usual or customary for foreign vessels to exhibit a stern or flash-light under circumstances like the present.

In the cases of *The Anglo-Indian* and *The Earl Spencer*, 3 Asp. Mar. Cas. 1, 4; S. C. 33 Law T. (N. S.) 233, 235, it was held that under exceptional circumstances, and when there is manifest danger of collision, it "may be the duty of the vessel ahead to give some warning to the overtaking ship, not necessarily by exhibiting a light, but by some signal, such as the firing of a gun, the showing of a light, or otherwise, which will indicate her whereabouts to the overtaking ship, and call the attention of that ship to the danger of a collision."

In the case of *The Oder*, 13 FED. REP. 272, where a collision under such circumstances occurred in a dark, overcast night, without fog, between a German steamer and a Norwegian bark, and the vessel ahead knew the overtaking vessel was out of range of her lights, BLATCHFORD, J., says: "The leading vessel was bound to indicate her presence. The exhibition of a light would have done so. Other means might have done so. Any proper means used seasonably would have arrested the course of the steamer and enabled her to avoid the bark;" and the bark was held in fault, because, though knowing the steamer to be coming up astern and out of range of her

lights, she "did not show a light or give any other warning, etc., in time," etc.

In the case of *The Earl Spencer*, L. R. 4 Adm. & Ecc. 431, which was affirmed on appeal,—33 Law T! (N. S.) 235,—Dr. LUSHINGTON, in 1875, held that the leading vessel was under no obligation to show a stern light; he says that to hold so, before new regulations were adopted, would lead to confusion and danger, and that the following vessel had no right to expect such a stern light; and in 1876, in the case of *The City of Brooklyn*, 1 Prob. Div. 276, the same general doctrine was reaffirmed on appeal in the Privy Council. In the case last cited no signal at all was given to the overtaking steamer; and yet the other was held exempt from fault, because it was supposed the steamer would go to leeward, and when the danger was perceived it was too late to give any useful signal. In the case of *The Oder*, *supra*, the leading vessel was held liable, because, though she perceived the danger, she did nothing to avert it.

In the present case there is no evidence that those on the brig supposed their red light could not be seen. The inference is to the contrary. Moreover, they did all that they could to notify the steamer, except to show a stern light, at least three to four minutes before the collision. Considering that the use of a fog-horn is all that was required by the rules and regulations then existing, applicable to French and English ships, to apprise vessels of their proximity to one another in a fog, and that there is no evidence that the exhibition of a stern light was usual or customary, or that the brig had any other means of signaling, it seems to me that the blowing of the three horns, as was done in this case, a light not being strictly obligatory, was a compliance with all that the British maritime law demanded under the rules then existing as a signal to the overtaking steamer. See *Leonard* v. *Whitwill*, 10 Ben. 638. The steamer, moreover, had notice of the brig in season to avoid her, had the steamer at once reversed her engines. So far as I can perceive from the evidence, no other signal than a light would have given any earlier or more precise knowledge of the brig's presence or whereabouts; and if not, then, as a stern light could not be insisted on, the giving of any of the other signals permissible was, in fact, immaterial in this case, since they would have conferred no earlier or better information than the steamer in fact possessed. In view of this fact, therefore, and that the brig gave such other signals as were within her power, a light not being indispensable, the failure to exhibit a stern light, even if the steamer was known to be astern of the range of her lights, was not such a breach of the brig's obligations, according to the law then existing, as renders her on that ground chargeable with fault.

2. Repeated consideration of all the testimony, however, has led me to the conclusion (1) that the steamer, at least when the order to starboard was given, was not two points aft of the brig's beam; (2) that the brig's red light ought to have been seen from the steamer;

(3) that it was not seen because it was either dim or improperly set, and not by reason of any inattention or fault of those on the steamer, and that the brig is in that respect chargeable with fault.

By the international regulations the colored side-lights are required to show two points abaft of abeam. Whether the steamer was within that range or not depended partly upon the bearing of the brig from the steamer, but still more upon the heading of the brig herself. Every variation of direction by the brig would change the range of her lights. The bearing of the brig is stated by the steamer's witnesses at a half point or point on her, the latter's, starboard bow. This, as we shall see, is too little; it must have been at least a point and a half. The brig's course, had it been fixed and constant, would have been easily determined from the testimony of her own witnesses; and that would have fixed the range of her lights. But her course was not fixed. She was sailing by the wind, close-hauled, and the wind was variable. Her own witnesses placed the wind at all points from W. S. W. to N. W., and the brig, says the captain, would sail "within six or six and one-half points of the wind, but that night was not sailing very close,—six, seven, or eight points off;" and he places her course as variable from S. to S. W. The helmsman and second mate give her course as S. S. W.; but the second mate expressly says he did not look at the compass after the steamer's lights were seen, nor does it appear that the helmsman did so; and the course given seems to refer to her general or average course. The master, who was in immediate control some three or four minutes before the collision, states that her course was variable from S. to S. W., with nothing more definite.

Had the bearing of the steamer's lights from the brig been given with any definiteness, that, also, would have determined the range of the brig's red light as respects the steamer. The testimony on this point, however, is very indefinite; but it agrees better with the steamer's being within the range of two points abaft the beam, than with her being astern of that range. Speaking of the time when her lights were first seen, the captain says "she bore abeam of us;" Douett says, "she was heading for our beam;" Michel says, "towards our beam;" Blanchet says, "pointing abeam of us—I mean pointing to hit amidships;" Michel and Robin say her lights were "on the port beam;" Douett and Mignon say they "were abeam;" Beon says they "were abeam to leeward, coming from the eastward." Had the steamer, when first seen, been due east, she would soon have come fully within range, even if the brig had been going S. S. W. None of these descriptions of the steamer's bearing indicate that she was more than two points aft of abeam. The libel states that she was approaching "a little abaft her beam," which, to my mind, would indicate less than two points abaft rather than more. But the fact that not one of the brig's witnesses speaks of the steamer as seen at any time off the brig's port quarter, as they would naturally have

done if she had been observed when a third of a mile distant, more than two points abaft of abeam, is strong evidence that she was not so much aft as two points. None of the diagrams of the brig's witnesses of the positions of the vessels before the brig luffed, show the steamer more than two points aft. The captain, also, when he came on deck and saw the lights "abeam," at once looked at his red light, as he says, "to make sure it was lighted;" evidently because he supposed the steamer was in range and would see it. None of the expressions of her witnesses, or of the master in his protest and letters, indicate that they did not suppose the steamer to be within range and able to see the brig's light aft; their complaint is that the steamer did not keep a proper lookout.

The natural inference from this testimony is strengthened by other established facts, which show conclusively that the steamer must have been less than two points aft of the brig's beam; because (1) the brig bore at least one and one-half points off the starboard bow when first reported, otherwise the collision could not have happened at all in the manner it did; and with that bearing, even if the brig were then sailing S. S. W., the steamer would in a few moments have come fully in range of the brig's red light; (2) because the necessary conditions of the collision show that the brig was sailing more southerly than S. S. W., viz., S. by W., if not due south, before she luffed, and either of these courses would have put the steamer in range of the red light.

Among the established facts of the case must be included (a) the steamer's course, W. S. W. or S. W. by W. ½ W., and her speed at 8 to 8½ knots; (b) the brig's course somewhere from S. to S. W., and her speed from one to one and a half knots; (c) the order to hard a-port as soon as the first officer was told that no lights were seen on the brig, and the helm got hard over in 30 to 40 seconds afterwards, i. e., within a minute or somewhat less after the brig was reported; (d) the order to stop the engines, and their being stopped by the time the helm was hard a-port; (e) that under a hard a-port wheel the steamer would make a circle of half a mile diameter, i. e., change one point in going every 300 feet; (f) that the brig luffed about two points before the collision; and, lastly, that when the steamer struck the brig their courses were nearly at right angles. The last is a controlling fact. The best witnesses on both sides all agree in that particular. The captain of the brig says she struck "end on, almost perpendicularly." The first officer of the steamer says "at right angles." The diagrams vary on each side of perpendicular. The captain's diagram makes the steamer point not over one point forward of a right angle. I adopt that, not merely as the result of all the direct testimony, but also because, if the steamer, when she struck, had been heading forward more than one point, she could not have shoved the brig off so as to clear her by going astern of her as she did, but would have gone across her and cut her through. The steamer, at

the time she struck, was, therefore, heading at least seven points west of the brig's heading, or nine points west of the brig's course before she luffed.

From the above conditions it follows (1) that the steamer under her port wheel changed at least three points; for even if the brig were previously sailing south, and afterwards luffed two points to S. S. W., the steamer heading, when she struck at least seven points west of that, would be going W. by N., *i. e.*, three points from her former course; (2) that the steamer must have gone at least a quarter of a mile after the brig was reported up to the collision, and occupied in so doing at least two and one-half minutes; for if her port-helm had been uninterrupted, she would have traveled 900 feet in changing three points, according to the master's testimony as to her rate of change, to which must be added at least 600 feet, passed over in three-quarters of a minute, before she was much under the influence of her port helm, as well as 100 or 200 feet more from the interruption of her port-helm: even if the master was very inaccurate, which is hardly probable, in testifying that the steamer would make a circle of a half-mile diameter under a hard-a-port-helm, and only one-third, or as much as two-thirds, of a mile, were the true statement, still a change of three points would make a difference of only about 300 feet either way in the distance above given; (3) that the steamer could not have changed more than five points, *i. e.*, to N. W. by W.; for there is no evidence that in the few minutes preceding the collision the brig's course before she luffed was further west than S. S. W.; and other considerations will show that the steamer could not have changed over four points.

If, now, a diagram be made of the courses and positions of the vessels, adopting the course of W. S. W. for the steamer, (which is the one most favorable to the brig,) and several different curves be drawn, on a scale representing a quarter of a mile radius, tangent at various points of the steamer's course, which points may be adopted to represent different intervals of time after the brig was first reported and when the steamer may have come fully under her hard-a-port-helm, then these curves will indicate very nearly the path of the steamer, under her hard-a-port-helm, from either of these tangential points. Such a drawing will immediately show conclusively that the brig when first reported must have been more than one point off the steamer's starboard bow; for there is no point near or distant on the line of such a bearing where the brig can be placed, (giving time and space for the steamer to have changed three points,) that the brig, going at the rate of one or one and one-half knots, would not have got considerably to the southward of the steamer, and wholly out of her way by the time the steamer had changed even two points. The steamer would then be heading due west, and any further change under her port wheel would carry her still further astern of the brig.

The libelant contends that there was a great deflection of the steamer to the south of the path of the curve given, through a starboard wheel continued during a considerable time; but even if the concurrent testimony of all the steamer's witnesses, that the wheel did not get to starboard at all, but only to amidships, when countermanded, were disregarded, still an inspection of the drawing, as above indicated, will show that no such deflection by the steamer, with her necessary return, so as to strike the brig nearly at right angles, was possible, for neither the time nor the space necessary for such a deflection and return to nearly right angles can be got in any position consistent with the foregoing conditions. Besides, had any such deflection by the steamer to the southward occurred after the steamer had changed two points, and had come near enough to see the brig's sails, such a change of course would have been plainly seen on the brig, through the changed position of the steamer's lights; and yet all the brig's witnesses say no such change was noticed. The testimony of the steamer's witnesses on that point must, therefore, be accepted as correct.

The statement in the abstract of the log, from which this deflection is argued, is not to be relied on. This abstract is evidently inaccurate in several particulars. The statement of her "canting to clear" the brig was inferential only; as the brig had not previously been distinctly seen; and the fact appears conclusively to have been otherwise, as the steamer's witnesses also distinctly testify. The only effect of the temporary interruption of the port wheel was to move the center of the brig's curve of motion somewhere from 100 to 200 feet due west.

To render the collision possible under the established conditions above specified, it will be found necessary to bring the brig, when first reported, somewhere upon a line bearing at least one and a half points off the steamer's starboard bow,—a variation from the lookout's estimate not incompatible with his intelligence or honesty. But, even upon this line, the brig cannot have been one-third of a mile distant when first reported, because, at that distance, she must have got to the southward, and out of the steamer's way, before the steamer's curve of motion could have intersected the brig's path, whether the latter were going S. or S. W.; and this will be found true though the steamer's curve of motion be interrupted and carried westward 200 feet at the time of the order to starboard, i. e., after a change of about two points.

Moreover, the diagram drawn as above will show that the steamer could not have changed more than four points to the westward, because there is no place which can be adopted for the position of the brig when first discerned, on a line drawn even one and one-half points off the steamer's starboard bow, but that the brig must have got to the southward and well clear of the steamer by the time the steamer could have made a change of four points, with an interruption of a straight course of 100 or 200 feet only. A change of four

points would bring the steamer heading W. N. W., and even before that she would be rapidly diverging to the northward and away from the brig. The result is that the brig, when first reported, must have been between 1,500 and 2,000 feet distant; that the steamer changed between three and four points only,—probably but little over three points,—and that the time between the brig's discovery and the collision was from two and one-half to three minutes; and that the brig, before she luffed, was sailing from S. to S. by W. These results, arrived at independently of any of the witnesses' mere estimates of time and distance, agree well, however, with the account and estimates given by the first officer; and this lends additional credit to his testimony in other particulars. That the brig could not have been sailing S. S. W., before she luffed two points, is manifest, because that would make the steamer, at the time of the collision, head N. W. by W., a change of five points, which the drawing will show is inadmissible. The master of the brig also says the brig sailed away on a "S. E. course, or within a point of that, after falling off four points,— perhaps five or six." This would at most carry her back to S. S. W., or to S. W. by S., and, deducting two points for luffing, we have her course previous as S. or S. by W. as above found.

If the course of the brig were S. or S. by W., her red light should have been in full view at the time the brig was first discovered; if S. S. W., light should have been seen in less than a minute after, and before the order to starboard, if the light was properly set and burning. That it was not seen at all cannot be due to the fog. There was a difference in the height of the brig's red light and the steamer's of only five or six feet; and the steamer's lights were plainly seen from three to four minutes before the collision, when nearly half a mile distant. Nor can the failure to see the brig's red light be reasonably ascribed to any inattention of the men on the steamer. All the evidence shows that they were alert and vigilant. Several witnesses were watching her, and testify that no red light was seen at all. Had the right light been seen, even a minute before the collision, it would have shown conclusively that the brig was going to the southward, and the mistake of supposing she was going north could not have been made, nor the consequent order to starboard the helm have been given. So important an order as the order to starboard, based on the absence of any light, is the strongest confirmation of the truth of the steamer's witnesses that no red light was seen or was visible. The only alternative is that the brig's red light was too dim to be seen, or else was improperly set, so as not to show two points aft of abeam. Most of the brig's witnesses swear, it is true, that the red light was burning and burning brightly. That the brig's witnesses are not very trustworthy, in regard to their observation of the lights, must be inferred from their all agreeing that no red light was seen on the steamer, whereas her necessary line of approach under her port helm, and their own diagrams, show that the steamer's red

light must have been visible some little time before the collision. The concurrent testimony of nearly all the brig's witnesses, that no change in the steamer's course was seen, also shows that their account of what they observed is very little to be relied on, either from the excitement of the occasion, inaccurate observation, defective memory, or suppression of the facts.

The testimony on the part of the brig, both as to the adjustment of the lights, and their being properly trimmed, is, certainly, unsatisfactory. The brig's lights were not arranged according to the regulations, which require screens. The brig had no screens; the bulwarks of the poop were used as a substitute; whether a sufficient substitute or not depended entirely on how the lights were adjusted below the rail; and this was necessary to be shown, for, on every departure from the regulations, the burden of proof is on the vessel to show that any substitute answers the same ends as that which the regulations prescribe. The second mate, by whom alone it was sought to prove that the brig's lights were proper lights, and so adjusted as to show two points aft of abeam, wholly failed to give any satisfactory testimony on that subject. Lepinçon, the salter, whose duty it was to trim the lights, if they did not burn brightly, testified that on this night he did not trim them "because they had been trimmed before he came on deck," which was at 10 P. M. But this was only his supposition; for, on cross-examination, he says it was the mate's duty in the other watch to trim them, and that he had not seen the lights trimmed. A. Douett, boatswain of one of the boats, however, testified that he was on the previous watch from 5 till 10 P. M., and put the lights in position that night, and that he thought the *salter* trimmed them before being put in place; from which it is evident that he did not trim them himself. Both mates were witnesses, and neither testified to having trimmed the lights, as would naturally be expected if they had, in fact, trimmed them. Each witness who testifies about trimming supposed some one else trimmed the lights. The natural inference is that they were not trimmed at all.

Under such circumstances of doubt, both as to the trimming and the adjustment of the lights, and the admitted absence of the ordinary screens, the testimony of the brig's witnesses, all of whom are directly interested in the recovery, that the lights were burning brightly, ought not to be held to outweigh the fact that there was no red light fulfilling the office of such a light, and visible two points aft of abeam. The burden of proof in this respect is upon the brig. *The Narragansett*, 11 Fed. Rep. 918; *The Albert Mason*, 2 Fed. Rep. 821. If it were strictly a question of veracity between the witnesses from the two vessels, superior credit ought to be given to those who at the time make so important an order as a sudden change of helm based on the absence of such a light. It is, however, not a question strictly of veracity, since, though the light were dim from want of trimming, this defect might not be noticed in the excitement of the occasion; and if

the adjustment was not proper, so as to show two points abaft, the light was defective from this cause, though burning brightly. In departing from the regulations it was the duty of the brig to show an equivalent substitute. She did not do this, and as no red light was seen, when I am persuaded it would have been seen if properly adjusted and burning, I am compelled to find the brig chargeable with fault in this particular. *The Ariadne*, 2 Ben. 472; *The Star of Scotia*, 2 FED. REP. 579, 597; *The Narragansett*, 11 FED. REP. 918; *The Roman*, 14 FED. REP. 61; *The S. H. Crawford*, 6 FED. REP. 906.

As to the question whether the brig luffed only when *in extremis*, and when the collision was unavoidable, or much earlier than that, the testimony of her own witnesses is extremely diverse. Blanchot, who was stationed amidships, says the helm was ported by the captain when the steamer was "about 400 meters" distant. Rochefort, the first mate, says that he came on deck "about two minutes before the collision," and that "when he went on deck he saw how the helm was," *i. e.*, put to port. Beon, the wheelsman, says it was put a-port by the captain's order, when the steamer was "about two ships' lengths" distant. This must have been from 200 to 250 feet, since, though the brig's length is not stated, her width was 21 or 22 feet, and it was 35 feet from stern to mainmast. Bastard, the second mate, estimates the distance at 50 meters only. The captain says that he took the wheel when the steamer was "perhaps 300 meters" distant, and thenceforward kept it; and "when I saw the steamer was close upon us, about 70 meters, I left the wheel, and the shock took place two or three seconds afterwards." He also states that all the rest had previously left the poop. This estimate of 70 meters is very nearly the same as that of the wheelsman. The salter, the only other person on the poop, says that he did not hear the order to port; that he had gone amidships when the steamer was about 100 meters off, but knew the helm was ported, because the brig luffed so that the sails shook, and that this was when the steamer "was close aboard of us."

The master and others of these witnesses say that the brig luffed to avoid being struck amidships and having their small boats smashed. The result shows plainly enough that the change did not contribute to that end. The circumstances, however, lead me to conclude that the estimate of the master and wheelsman is most nearly correct, and that the change was made nearly a half minute before the collision; for as the steamer seemed to be approaching so as to strike amidships when the order was given, and struck some 50 feet further astern, this 50 feet represents mainly the brig's progress in the interval, and that would occupy about a half minute, or a little less, as her speed when going at so slow a rate would not be much decreased during that period of luffing. As the steamer during this time was under reversed engines, she probably approached the brig at an average speed of not over four or five knots, making about 200 or 250 feet

in this half minute, which agrees nearly with the master's estimate of a distance of 70 meters when his order to port was given.

The forward motion of the brig, during this time, could not, I think, have been so much checked, that, but for this change of helm, she would have gone clear. The order, moreover, was evidently given when the collision appeared to those on board the brig to be inevitable, and was given for the purpose only of preserving their small boats,— their last hope and resource if the brig were struck. Even, therefore, though the order to luff was erroneous and useless, as it doubtless was, it was given *in extremis,* under the stress of apparent necessity, and when instant destruction seemed to be impending. In such cases even an error is not imputed as a fault. *The Favorite,* 18 Wall. 598, 603; *The City of Paris,* 9 Wall. 634, 638; *The Farnley,* 1 FED. REP. 631, 637.

If the brig's luff of two points was made, as I conclude it was made, within half a minute of the collision, it affords no explanation of her red light's not being seen from the steamer. If, however, her luffing was what prevented her red light's being seen, then this luff must have taken place much longer before the collision than I have found, and much nearer to the time and distance assigned for its occurrence by Rochefort and Blanchot, viz., two minutes before the collision, and when 400 meters distant. In that case the brig's change of course by luffing would be a change made too early and at too great a distance from the steamer to be treated as a change *in extremis,* (*The City of New York,* 15 FED. REP. 628,) and the brig would be held in fault for violating the rule which required her to keep her course. A drawing of the situation of the two vessels as above indicated, and the necessary conditions of the collision, will show that any luff made sufficiently long before the collision to have hid the brig's red light from the steamer, must have been made at too great a distance to be excused as a change *in extremis,* and at such a distance also as to have checked the brig's speed sufficient to have prevented her going clear of the steamer.

In either view, therefore, the brig is chargeable with fault and entitled to recover but half her damages and costs, for which judgment may be entered, with a reference to compute the amount