## THE COL. JOHN F. GAYNOR.

### (Circuit Court of Appeals, Third Circuit. July 7, 1904.)

### No. 34.

1. COLLISION—VESSEL AT QUARANTINE STATION—DUTY OF PASSING VESSELS.

A steamship, which has stopped her machinery, while lying at a quarantine station, where it is not customary to anchor, and is moving only slightly with the tide and without headway, has to a large extent the rights of a vessel at rest as regards other vessels that are passing.

2. SAME—STEAMER AT REST—PASSING TUG WITH TOW.

An incoming British steamship in charge of a licensed pilot stopped in the daytime off the quarantine station in the Delaware river, at the usual place, which was not more than two lengths from the pier on the western side, to undergo the customary medical inspection. She did not anchor, and it was not customary to do so. While so lying, with the quarantine flag up, and while the inspection was being made, a tug came down the river with two heavily laden scows, without rudders, in tow on a line which made the tow from 1,400 to 1,600 feet long. Each vessel saw the other when a mile distant, and the tug understood the position of the

steamship and the purpose for which she had stopped. The tug was properly on the westerly side of the channel, but there was ample room for her to pass to the eastward, so as to avoid any danger of collision. She had no lookout on the stern to keep watch of the tow, and passed so close to the steamship that both of the scows, sheering as she turned from the straight course, struck the steamship, and injured her. *Held*, that the steamship was entitled, under the circumstances, to the rights of a vessel at anchor, and that the tug was solely in fault in failing to keep at a safe distance in passing.

Appeal from the District Court of the United States for the Eastern District of Pennsylvania.

For opinion below see 115 Fed. 382.

See 124 Fed. 743.

La Roy S. Gove, for appellant.

J. Parker Kirlin, for appellee.

Before ACHESON, DALLAS, and GRAY, Circuit Judges.

GRAY, Circuit Judge. This is an appeal from the decree of the District Court for the Eastern District of Pennsylvania, in admiralty. The findings of fact, as contained in the opinion of the learned judge of the court below, are as follows:

"McPherson, J. This is an action brought to recover damages for a collision that took place about 3 o'clock in the afternoon of June 16, 1899, between the tug John F. Gaynor and the British steamship Vedra, in which the steamship was injured. The Vedra was on her way from London to Philadelphia in ballast, drawing about ten feet of water, and was proceeding up the Delaware river in charge of a duly licensed pilot. She is a tank vessel, built of steel, 2,622 tons net register, 435 feet long, 45 feet beam, and was properly manned and equipped.

"As she approached the Reedy Island quarantine station, which is upon a pier running parallel with and close to the western edge of the channel, the quarantine flag was hoisted upon her foremast, her engines were stopped and by the time she came nearly abreast of the station her way had practically ceased, so that she was merely being borne slowly up the river by the tide, which was then nearly flood. She did not anchor, but the testimony shows clearly that it is not customary for vessels to anchor while the medical examination is going on. A government boat put out from the station carrying a physician, and the examination was begun. While it was going on, the tug came down the river, towing two square-bowed scows tandem, each being heavily loaded with stone and drawing 12 or 13 feet of water. The total length of the tow was from 1,400 to 1,600 feet, each scow being 30 or 40 feet wide and about 150 or 160 feet long and having no rudder or independent means of propulsion.

"The day was clear, and the wind was blowing briskly from about northwest Each vessel saw the other more than a mile away, and understood the other's character and situation. The tug did not expect the steamship to anchor, but knew that she was lying at rest upon the water, undergoing, or about to undergo, examination by the quarantine physician. The boiler of the tug was not in very good condition so that she was not able to exert her full power, but she was proceeding down the river against the tide at a speed of 3 or 4 knots an hour. At the time she saw the steamship, the tug was on the westward side of the channel, and, under ordinary circumstances, it was proper that she should be where she was. But, when she saw the steamship at rest upon the water with the quarantine flag flying, and knew that she was obliged to interrupt her voyage until the examination should be completed, it became the duty of the tug, as the moving vessel, to take every reasonable precaution to keep out of the way. There was ample room and depth of water for the tug to pass so far from the steamship that no collision could have possibly

taken place. The channel was wide at this point, and there were no vessels near enough to offer any obstruction. The tug, however, kept her course so closely that when she approached the steamship it was evident that she would be obliged to pass within a few feet. She herself managed to get by in safety, but the first scow sheered toward the steamship and broke one of the blades of the screw, and the second scow sheered more decidedly and with her forward starboard corner struck the ship a severe blow on the starboard bow, doing a good deal of damage.

"It is argued on behalf of the tug, that the steamship was at fault, because she did not anchor, because she was too far out in the channel, and because it is averred that she made certain movements with her engines that put the ship into a more dangerous position than she would have otherwise occupied. It is also argued that she did not keep a proper lookout, and therefore did not see the tug in time to move out of the way. In my opinion none of these charges is well founded.

"The pilot and second officer were on the bridge, other officers and men were on the deck, and the tug was seen more than a mile away. The steamship stopped in the customary place, and was not, I think, more than 500 or 600 feet from the station. She was not obliged to anchor in the absence of special circumstances indicating that to be her duty. I am also of opinion that her engines were not put into motion at all while she was undergoing examination. An order to go ahead was undoubtedly given, but it was countermanded immediately, and was not carried into effect. No signals were given by either vessel, and none was required. I see no reason, therefore, to charge the steamship with any fault. As it seems to me, the collision is properly chargeable to the tug, for approaching too close to the ship with so unwieldy a tow. It is well known that scows of this description are very apt to sheer, as they have no rudder, or other means of guidance than the tug itself, and as these were being towed on a very long hawser, the danger of sheering was increased. The tug was bound to take note of the position of the ship and the business upon which she was engaged, and to pass far enough to the eastward to avoid the danger of collision. Apparently, she either miscalculated the distance or put off the effort to take the tow to the eastward until it was too late."

From a careful examination of the testimony sent up to us in the record of this case, we are of opinion that the learned district judge was right in his findings of fact, and in the conclusions founded upon them.

Counsel for the appellant contends, with much force and ingenuity, that the tug was not in fault in her navigation, and that the steamship was solely in fault for the collision. The court below has found as a fact, that the Vedra was coming up the river in charge of a competent and licensed pilot, and that, at the lower end of Reedy Island, she hoisted a quarantine flag, and stopped, as under the circumstances she was bound to stop, to be boarded by a quarantine physician from the station at the upper end of the island. The island is something less than a mile in length, running nearly parallel with the center line of the channel, the course of which up the river would be north 14 degrees east. Necessarily, she ran to the westward side of the channel, to accommodate the boarding officer, and after her engine stopped and the physician was on board, her headway and the flood tide carried her up abreast of the quarantine station, and about 800 feet or two ship lengths away. The pilot and second officer were upon the bridge, and during all the time covered by the events detailed in the record, the captain was mustering the other officers and crew, for examination by the physician. The tug with her tow was coming down to the westward of the middle of the channel, as, under ordinary circumstances, she was entitled to do, and the steamship was in full

view of those on board the tug for more than a mile above the quarantine. The engines of the steamship, from the time they stopped at the lower end of the island, were not in motion, until just before the collision, when they were started ahead, in consequence of the impending peril of a collision with the barge, but were immediately stopped by the pilot, to avoid cutting the barge with the propeller. The steamship was practically in the situation of a motionless ship, moving only with the drift of the tide, without steerageway. The purposes for which she had stopped, were perfectly understood by the pilot and all others on board the tug.

The court was right in its statement, that under ordinary circumstances, the tug and tow should be where they were, that is, on the westward side of the channel. But the "ordinary circumstances," to which the learned judge alludes, would be where the steamer was under way, coming up the channel. In such a case, the steamer would presumably have passed on the port side, or to the eastward of the tow, and the tug would have probably borne a little more to the westward, to insure a safe passage. But these were not the circumstances of the case before us. The steamship was not under way, but had stopped for a proper purpose, well understood by those in charge of the tug, and though not exactly in the situation of a ship at anchor, had, to a large extent, the rights of a ship at rest, in regard to the movements of a passing vessel. The head of the steamer was always veered a little toward the westward of the channel, and it was perfectly apparent to the tug that it must pass to the eastward of the steamship. That this was in fact understood to be its duty by the tug, is evidenced by the fact that no attempt was made to do otherwise than pass to the eastward of the steamer, while practically at rest off the quarantine station. There was ample room in the channel eastward of the steamer, at least a half mile of water navigable for the tug and her tow.

The fault, it seems to us, as it seemed to the court below, was that, in passing to the eastward, those navigating the tug did not go far enough to allow for the sheering of the two barges, the towlines of which were, in the aggregate, 800 or 900 feet long, and the testimony shows that with towlines of such length, the sheering takes a very wide range. The barges were square at the ends, and were without rudders, so that, when the tug changed its course, to itself avoid the steamer, it was natural to expect that the barges would not be straightened out in the wake of the steamer for some appreciable time, and that the tendency to sheer would be augmented by the changed course of the tug. These conditions, those navigating the tug were bound to recognize and to exercise the degree of care and caution in passing the steamer made necessary thereby.

That a tug with such a tow is properly called an incumbered vessel, is most true, and, in a narrow channel, and when meeting steam vessels under way, is entitled to a consideration and indulgence often recognized by the courts. But, on the facts presented by this record, the tug is entitled to no such indulgence. The channel above and below the point of collision was wide, the course running straight past the quarantine and parallel with the island for a distance of between

four and five miles. The incumbrance of the tow, and the difficulty and danger ensuing therefrom, in passing any object at rest, must, as we have said, be recognized by those in charge of the tow, and in proportion to the danger and difficulty is the measure of duty imposed to avoid it. We repeat that, under the circumstances of this case, the Vedra was entitled to the privileges and rights of a vessel at rest. She was well over on the western side of the channel, was not under steerageway, and the pilot of the tug understood that it was his duty to pass to the eastward, and as ample room for that purpose existed in that direction, the responsibility of making a safe clearance of the vessel not under way, rested on the tug.

We do not find the contention of appellant, that the force of the wind and tide together had drifted the steamer so far to the eastward as to have contributed to the collision, to be supported by the evidence. The wind was northwest and light, and the pilot had kept the steamer's head well into the wind. But even if the steamer had, from the effect of the wind or the tide, or both, been carried, while not under way, toward the tow, such fact must have been apparent to the tug, and upon her rested the responsibility of taking that drift into the account. A steamer that is stopped, so far as her machinery is concerned, has, when her steerageway is gone, under such circumstances as these, the rights of a vessel at rest, as regards other vessels that are passing.

A matter in evidence, which should not be overlooked, is that there was no lookout on the stern of the tug to observe the situation of the barges in tow. Such a lookout, as the tug was approaching the steamer, might have given timely notice to the pilot of the danger threatened by the sheering of the tow, so that it could have been avoided by proper caution on his part.

We think the decree of the court below should be affirmed, and it is so ordered.