---

## THE RUTH.

### (Circuit Court of Appeals, Ninth Circuit. February 14, 1911.)

### No. 1,881.

1. COLLISION (§ 67*)—NAVIGATION RULES—CONSTRUCTION—"UNDER WAY."
   A steam vessel lying with her nose against the bank of a stream, and holding her position against the current by the movement of her wheel, is a vessel "under way" within the navigation rules, and not entitled to the rights of an anchored vessel.

   [Ed. Note.—For other cases, see Collision, Dec. Dig. § 67.*
   For other definitions, see Words and Phrases, vol. 8, p. 7161.]

2. COLLISION (§ 94*)—LIABILITY OF VESSEL FOR TORTS—VIOLATION OF RULES OF NAVIGATION.
   The steamer Ruth was following the steamer Oregona up the Willamette river, and was close behind when they reached the Clackamas rapids. The Oregona was unable to ascend the rapids by her own power, and, after going as far as possible, sent men ashore to make fast a steel line for the purpose of pulling her up by means of a capstan. She was unable to held her position, and began to drift down with the current, dragging the line, which libelant, one of her crew, was directed to pull in and coil on the deck. As soon as she began to drift, she gave danger signals to the Ruth, which had entered the rapids, pushed against the bank and was holding herself there by her wheel. She paid no attention to the signals, but as the Oregona drifted by started ahead and her wheel picked up the line, which caught libelant, severing both his feet. *Held*, that the Ruth was in fault in failing as an overtaking vessel to drop

┊  .down and keep. out of the way when signaled; there being evident dan-
· .· ger of·fouling the Oregona's line.
  ˸· ·  [Ed. Note.—For other cases, see Collision, Dec. Dig. § 94.*]

3. Collision (§ 113*) — Action Against Vessel for Tort — Contributory
  Negligence.
    A deck hand engaged in the duty of coiling a cable, dragging in the
  water and being hauled in by other hands, is not required to watch the
  movements of other vessels, but has the right to assume that they will be
  properly navigated and with due regard to his safety, and, where he is
  injured by the negligence of another vessel in picking the cable up with
  her wheel, he cannot be charged with contributory negligence because he
  was unprepared for such event.
    [Ed. Note.—For other cases, see Collision, Dec. Dig. § 113.*]

4. Admiralty (§ 50*)—Bringing in New Parties—Discretion of Court.
    Conceding that a court of admiralty had power to grant the petition of
  a libeled vessel for process to bring in another vessel under admiralty
  rule 59, not filed until after hearing and decision of the cause, it was
  within its discretion to deny such petition.
    [Ed. Note.—For other cases, see Admiralty, Dec. Dig. § 50.*]

Appeal from the District Court of the United States for the District of Oregon.

Suit in admiralty by Virgil K. Poland, by Edward N. Deady, his guardian ad litem, against the steamer Ruth, the Oregon Railroad & Navigation Company, claimant. Decree for libelant, and claimant appeals. Affirmed.

See, also, 178 Fed. 749.

·On the morning of October 15, 1907, the river steamers Oregona and Ruth were on their way up the Willamette river from Portland to Oregon City and beyond. The appellee was a deck hand on the Oregona. Both vessels reached the Clackamas rapids at about the same time; the Oregona being a few boat lengths in advance. The water was unusually low, and a current variously estimated at from six to ten miles an hour set strongly against the west bank of the river. Neither vessel was able to proceed over the rapids by its own power, and both were required to make their way by the aid of a line put out and fastened to a "dead man" on the west shore of the river, and the use of a capstan. The Oregona steamed up as far as she could go, and put a portion of her crew ashore on the west bank with a steel cable for the purpose of attaching the same to a "dead man." About the same time the Ruth, which was within about two boat lengths of. the Oregona, pushed her nose into the west bank,. holding herself there by the movement of her wheel. She also put part of her crew ashore with a line to be attached to the "dead man" as soon as the Oregona had passed over the rapids. The Oregona, using her whole power, was unable to hold her position against the current until her ·line could be·attached, and she commenced to drift downstream toward the Ruth. She gave orders to haul in the line, and she sounded danger signals as a warning to the. Ruth that she was drifting. She continued.to drift; the appellee and other members of the crew drawing in her line as fast as they could and coiling it on deck. The danger signals were repeated. The Ruth held her position, and continued the movement of her wheel. The Oregona drifted alongside the Ruth, and her captain had some conversation with the captain of the Ruth; the former suggesting that the latter move downstream. The captain of the Ruth answered that he could not do so because his boat was crowded into ·the bank. The Oregona then dropped down, touching the Ruth on her port side. Shortly after the·bow of the Oregona passed the stern of the Ruth, the wheel of the latter picked·up the·line of the Oregona which was still in the water, rapidly wound it up, and caught the appellee, who was hauling it on the deck of the Oregona, producing the injuries which are the cause of the suit. The court below said: "There· is some conflict in the testimony as to

whether the Ruth was moving upstream at the time the line was picked up, or whether it was done by the wheel while the boat was stationary. The great weight of evidence in my opinion is to the effect that, as soon as she was clear of the Oregona, the Ruth, which was the more powerful boat, immediately steamed up at full speed in order to get ahead of and over the rapids before the other boat, and thus picked up the line." The evidence, while conflicting in some particulars, showed without conflict the following facts: That the Ruth was held against the west bank of the river solely by the movement of her wheel; that while the master of the Oregona was attempting to warp his vessel over the rapids the master of the Ruth went below to direct the splicing and putting out of his cable, and that there was no one in the pilot house of the Ruth: that, as the Oregona was being forced down the stream toward the Ruth in spite of the use of all her steam power, her captain gave the danger signal immediately, and on the failure of the Ruth to answer repeated the signals, his boat all the time drifting downstream, and the current carrying it towards the west shore, and that the master of the Oregona called to the mate of the Ruth to get his boat out of the way. The captain of the Ruth admitted that he heard the signals, and that he made no effort to get out of the way of the Oregona, and gave as an excuse therefor that he supposed the signals were intended as a bluff to induce him to get out of the way.

W. W. Cotton, A. C. Spencer, Wallace McCamant, and Zera Snow, for appellant.

Newton McCoy and H. B. Nicholas, for appellee.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

GILBERT, Circuit Judge (after stating the facts as above). Rule 24 of the rules for harbors, rivers, and inland waters provides:

"Notwithstanding anything contained in these rules, every vessel overtaking another shall keep out of the way of the overtaken vessel."

And further declares:

"And no subsequent alteration of the bearing between the two vessels shall make the overtaking vessel a crossing vessel within the meaning of these rules or relieve her of the duty of keeping clear of the overtaken vessel until she is finally past and clear."

The rules also provide that a vessel is under way within their meaning "when she is not at anchor or made fast to the shore or aground." Act June 7, 1897, c. 4, 30 Stat. 96 (U. S. Comp. St. 1901, p. 2883).

It is contended that the Ruth was entitled to all the rights of a vessel at anchor, and that, although she had not her anchor out and was not made fast to the shore nor aground, she was nevertheless a vessel at rest as fully as if she had been at anchor. It has been held that a vessel which has stopped her machinery and lies practically motionless without steerage way has to a large extent the right of a vessel at rest in regard to other passing vessels. The Col. John F. Gaynor, 130 Fed. 856, 65 C. C. A. 340; Britain S. S. Co. v. J. B. King Transportation Co., 131 Fed. 62, 65 C. C. A. 300. But the Ruth had not stopped her machinery. She was under control, and had steerage way, and there was nothing to prevent her dropping downstream on receiving the signals of the Oregona. The fact that her nose was rammed against the shore while her wheel was turning at the rate of 30 revolutions to the minute brought her no more at rest or at anchor than she would have been had her stem been pointed

against the current and she had been held in position by the revolutions of her wheel. Clearly the first fault of the Ruth was in not dropping downstream at the approach of the Oregona. Her second was in starting up before the cable of the Oregona passed her wheel. That she did so start is found by the trial court, and, although the evidence upon that point of the case is conflicting, we find upon a careful review of it no reason to question the finding of the trial court. The Oregona having failed to make the passage of the rapids was carried down the stream by the current, which was running from six to ten miles an hour, and which carried her at a speed of two miles an hour, notwithstanding all her efforts to maintain her position. The Ruth was holding her nose against the bank at a point in the rapids where the whole volume of the river ran in a channel not more than 75 or 100 feet wide, and her stern stood out in the river from one-half to two-thirds of the distance across the stream from the west bank while the current set strongly toward that bank. By stopping the revolution of her wheel, she could have drifted downstream with the current, and it was her duty to do so, and to keep out of the way of the Oregona. In the exercise of ordinary care, she should have known that the Oregona's cable was in the water and was being carried by the current toward the west bank, and that it might become entangled in the wheel of the Ruth if she held her position or proceeded upstream. The testimony of the captain of the Ruth that the reason why he gave no heed to the signals of the Oregona was that he supposed they were intended as a bluff to induce him to get out of the way indicates that his purpose was to hold his position and get ahead of the Oregona. Upon all the evidence, we find no error in the conclusion reached by the trial court that the Ruth was liable for the injury to the appellee.

A more serious question is found in the contention that the appellee was guilty of such contributory negligence as to bar his right of recovery. The Oregona's cable was put off her starboard bow. The appellee was engaged in retrieving it and coiling it on the deck in a coil which was made wide owing to the kinks in the cable. He was standing between the coil and the starboard side of the vessel. It is argued that he assumed the risk of the cable being caught on the bottom of the river or by the wheel of the Ruth, a risk which he might have avoided had he stood on the port side of the bow and coiled from that point, and it is said that the Oregona's negligence also contributed to the injury, in that her cable was not taken up by a reel, and that the vessel had no mate on board to supervise the work. It is not apparent, however, that the appellee or any reasonably prudent person occupying his position should have apprehended danger from the action of the other vessel. A deck hand so employed necessarily directs his attention to the work which he has in hand. He has little opportunity to observe the movement of a neighboring vessel, and he has the right to assume that such a vessel will be navigated in accordance with the rules of navigation and with due regard for his safety. The possibility of the steel cable becoming caught in the bottom of the river was too remote to be considered, and there was

no evidence that such a thing had ever occurred. The evidence was that the cable of the Oregona was being taken in and coiled in the method which had been in use for years on that and other boats. The appellee testified that he was coiling the cable and the other deck hands were pulling it in, and that the coiling of the cable took all his time and attention; that he could not keep track either of his own boat or of the Ruth, and at the same time coil the cable; that the other deck hands were pulling it in; and that he had to keep coiling it up to keep it from getting tangled. He further testified that he did not know at the time where the Ruth was or how close she was to the Oregona. In view of the evidence, we are not convinced that the appellee did or omitted to do anything showing such contributory negligence as to defeat his right to recover damages for the injuries which he sustained.

Error is assigned to the denial of the appellant's petition for process against the Oregona to bring it into the cause under the fifty-ninth admiralty rule, a stipulation for costs having been filed with the petition. The rule permits such an application, in a suit for damage by collision, to bring in another vessel, upon suitable allegations showing fault or negligence of that vessel contributing to the collision, but it provides that the petition shall be presented before or at the time of answering the libel "or within such further time as the court may allow." In the present case, the petition was presented after the final submission of the cause upon the testimony, and after the announcement of the decision of the court, but before the entry of the decree. We need not pause to inquire whether the court below had the power to entertain the petition at that time. Admiralty rule 59 has been liberally construed and applied in consonance with its purpose and the equitable spirit of the admiralty practice. The Barnstable, 181 U. S. 464, 21 Sup. Ct. 684, 45 L. Ed. 954; Dailey v. City of New York (D. C.) 119 Fed. 1005. But if, indeed, the trial court had the power, in the exercise of its discretion, to entertain the petition at the time when it was presented, it is very clear that there was no abuse of discretion in denying the petition under the circumstances disclosed in the record and especially in view of the evidence in the case, the whole of which was then before the court.

The decree is affirmed.