THE GEORGE W. ELDER.

DOE v. COLUMBIA CONTRACT CO. et al.

(Circuit Court of Appeals, Ninth Circuit. April 1, 1918. Rehearing Denied May 13, 1918.)

No. 3073.

1. COLLISION ⬸102—OVERTAKING VESSEL—LIABILITY.
    As article 24 of the International and Inland Rules (Act Aug. 19, 1890, c. 802, § 1, 26 Stat. 327 [Comp. St. 1916, § 7863]; Act.June 7, 1897, c. 4, § 1, 30 Stat. 101 [Comp. St. 1916, § 7898]) makes an overtaken vessel the judge as to when the overtaking vessel can safely pass, a steamer, which overtook on the Columbia river a vessel engaged in taking barges in tow, *held* wholly liable for a collision, where it continued on its course despite the refusal of the vessel overtaken to signal its consent; for, while the refusal of consent was a fault. it was the duty of the overtaking vessel not to attempt to pass at that point until consent was signaled.

2. COLLISION ⬸69—VESSEL AT ANCHOR—WHAT IS—"UNDER WAY."
    A vessel lying dead in the water, while taking in tow three barges which had been dropped by another vessel, must be deemed a vessel "under way," within Act June 7, 1897, c. 4, 30 Stat. 96 (Comp. St. 1916, §§ 7872–7909), not being at anchor, or made fast to the shore, or aground.
    [Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Under Way.]

3. COLLISION ⬸69—PRECAUTIONS FOR PREVENTING—VESSELS ANCHORED.
    Though a vessel taking in tow three barges, which had been dropped by another vessel, be deemed at anchor, instead of under way, the obligation of care on the part of an overtaking vessel is not lessened.

4. COLLISION ⬸77—LIABILITY—DUTY OF MAINTAINING LOOKOUT.
    A vessel cannot be held in fault for failure to maintain a lookout, where the absence of a lookout in no way contributed to the collision.

Appeal from District Court of the United States for the District of Oregon; Charles E. Wolverton, Judge.

Libel by the Columbia Contract Company against the steamship George W. Elder, her engines, etc., claimed by Charles P. Doe, who filed a stipulation, with the United States Fidelity & Guaranty Company as surety, upon which the vessel was delivered. There was a decree for libelant, and claimant appeals. Affirmed, with directions.

The facts in this case, as the court below found them to be, are in substance as follows: The Columbia Contract Company was engaged in transporting rock down the Columbia river to Ft. Stevens. The rock was transported on barges, about 150 feet in length and from 35 to 36 feet in beam. Two steamers were used for this purpose, the Kern and the Hercules. The barges were taken in groups of three, and it was the custom to transfer them before reaching the lower river from the Hercules to the Kern; the latter being of deeper draft. In towing position the steamers carried one barge directly ahead, and one on each bow overlapping the head barge. On the night of the collision the Kern was engaged in taking in tow three barges which had thus been dropped by the Hercules. The barges had swung around, so that they were heading toward the Oregon shore. The Kern, heading down the river, had gotten a line from her port bow to the port quarter of the starboard barge, when the Elder, an ocean-going passenger steamer heading down the stream astern of the Kern, blew a passing signal of one whistle, and the pilot of the Elder testified that at the same time he slowed

⬸For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

his engines, as requested by the Contract Company to do, when passing its barges. The Kern answered with the danger signal. The Elder repeated her passing signal, and the Kern again answered with the danger signal, and very soon thereafter, the Elder struck the Kern on her starboard quarter at an angle of about 34 degrees and 16 feet abaft her beam. At the time when the Elder blew her first passing signal, the vessels were about half a mile apart. The Elder was headed so as to show to the Kern her masthead and running lights. The night was dark, but clear. The river at the point of collision was about a mile in width, and was navigable for heavy draft vessels up to within from 40 to 100 feet of the Washington shore, and for a half a mile on the Oregon side of the Kern. The water was slack, with no appreciable current. When the Elder had approached to within 500 or 600 feet of the Kern, she put her helm hard astarboard and reversed her engines to full speed astern. This gave her a curving course to port. The court below held that, under the provisions of article 24 of the International and Inland Rules, it was the duty of the Elder to keep out of the way of the Kern, and that, having heard the response to her first passing signal, it was her duty not to attempt to pass the Kern until it could be safely done, and that the rule makes the overtaken vessel the judge as to when the overtaking vessel can safely pass, and that the collision was due solely to the fault of the Elder.

H. W. Glensor and Ernest Clewe, both of San Francisco, Cal., and Sanderson Reed, of Portland, Or., for appellant.

Joseph B. McKeon, Edward J. McCutchen, Ira A. Campbell, and McCutchen, Olney & Willard, all of San Francisco, Cal., and Wood, Montague, Hunt & Cookingham, Erskine M. Wood, and C. E. S. Wood, all of Portland, Or., for appellees.

Before GILBERT, MORROW, and HUNT, Circuit Judges.

GILBERT, Circuit Judge (after stating the facts as above). [1] It seems clear that the Kern was at fault in the first instance in not signaling her consent to the first passing signal of the Elder. The Kern and her tow lay in the channel way and at least 1,000 feet from the Washington shore. There was ample room for the Elder to pass to starboard, without danger to the Kern or her tow. The only reason which Moran, the pilot of the Kern, assigned for answering with the danger signal, was that the Elder was headed directly for him, and that there was going to be a collision, and that he could see no evidence that the Elder had started to turn to starboard. He did not think that it was unsafe for the Elder to pass, but that it was unsafe for her to come farther on her course. Moran, it appeared, was laboring under a misapprehension of the rule, and he thought that the law required the Elder to accompany her whistle by an alteration of her helm, so that the Kern could see what she was doing.

The fault of the Kern was a grave one. But for her pilot's refusal to assent to the passing signal, the Elder would undoubtedly have passed to starboard, and a collision would have been avoided. But we are not convinced that the court below erred in holding that the proximate cause of the collision was the fault in navigation of the Elder, and that the fault of the Kern was not a contributing cause. It was the Elder's duty, on hearing the first danger signal, to proceed no further in the attempt to pass. By the rules of navigation the pilot of the Kern was made the judge of the necessity for giving the

danger signal. Responsibility for the collision must be determined from the situation as it existed from and after the time when that signal was given. The duty was imposed upon the Elder "under no circumstances" to attempt to pass at that point, or until the Kern signified her consent. At that time, and for some appreciable time thereafter, it was obviously possible for the Elder to keep clear of the Kern, as it was her duty to do.

[2, 3] The appellant contends that the Kern was lying dead in the water, and was therefore not an overtaken vessel. It is not disputed that the side lights of the Kern were not visible to the Elder, and that the latter was not coming up from any direction more than two points abaft the Kern's beam. The appellant's answer admitted that the Kern was a vessel under way, and thus correctly stated the situation, for the Kern was "not at anchor, or made fast to the shore, or aground." Act June 7, 1897, c. 4, 30 Stat. 96; The Nimrod (D. C.) 173 Fed. 520; The Ruth, 186 Fed. 87, 108 C. C. A. 199. But, even if the Kern were to be deemed to have had the rights of a vessel at anchor, the obligation of care upon the part of the Elder would have been in no degree lessened. The Col. John F. Gaynor, 130 Fed. 856, 65 C. C. A. 340; The Lucile (D. C.) 169 Fed. 719.

[4] The contention that the Kern was at fault in not maintaining a lookout is answered by the fact that the absence of a lookout in no way contributed to the collision. The pilot, who was on the bridge of the Kern, saw the Elder immediately upon her sounding the first signal to pass. The mate and the deck hands were forward of the forecastle head, and a watchman was on the barges. The absence of a proper lookout is unimportant, when it has nothing to do with causing the disaster. The Fannie, 11 Wall. 238, 20 L. Ed. 114; The Nacoochee, 137 U. S. 330, 11 Sup. Ct. 122, 34 L. Ed. 687; The Blue Jacket, 144 U. S. 371, 389, 12 Sup. Ct. 711, 36 L. Ed. 469; The Havana (D. C.) 54 Fed. 411; The Livingstone, 113 Fed. 879, 51 C. C. A. 560; The Aurora, 198 Fed. 383, 117 C. C. A. 259.

The decree is affirmed, with directions to the said District Court to enter judgment for costs and interest against appellant and his stipulator on the appeal bond, and with costs in this court in favor of the appellees and against the appellant.