## THE NORMAN BRIDGE.

(Circuit Court of Appeals, Second Circuit. July 12, 1926.)

No. 372.

Collision ☞42.

Evidence *held* to establish sole fault of vessel causing collision with another vessel of convoy engaged in zigzag maneuver.

Hough, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the Southern District of New York.

Libel by the Frederick Leyland Company against steamship Norman Bridge, her engines, etc., the United States, claimant, to recover damages for collision, and cross-libel by the United States against the steamship Nitonian, the Frederick Leyland Company, claimant. From a decree dividing and awarding damages, both parties appeal. Decree modified, and libel of the Frederick Leyland Company dismissed.

See, also, 290 F. 575.

Burlingham, Veeder, Masten & Fearey, of New York City (Charles C. Burlingham,

VanVechten Veeder, and P. Fearson Short-ridge, all of New York City, of counsel), for the Nitonian.

Emory R. Buckner, U. S. Atty., of New York City (Horace M. Gray, Sp. Asst. U. S. Atty., of New York City, of counsel), for the United States.

Before HOUGH, MANTON, and HAND, Circuit Judges.

MANTON, Circuit Judge. On September 19, 1918, the steamships Nitonian, owned by the Frederick Leyland Company, Inc., and the Norman Bridge, owned by the Pan-American Petroleum & Transport Company, under requisition by the United States and chartered to the United States Shipping Board, were in a convoy of vessels about 900 miles east of New York and on a voyage to the United Kingdom. Each vessel was damaged by reason of a collision, and the owners filed libels seeking to recover their loss. The two causes were consolidated and tried together. The trial judge, citing The Western Maid, 257 U. S. 419, 42 S. Ct. 159, 66 L. Ed. 299, sustained the government's exceptions to the jurisdiction. An interlocutory decree was entered accordingly, dismissing the Leyland Company's libel for want of jurisdiction. The damages were agreed upon. Before entry of the final decree, however, the Supreme Court handed down a decision in United States v. Barque Thekla, 266 U. S. 328, 45 S. Ct. 112, 69 L. Ed. 313, which held that, where the United States came into court to assert its claim, the court was empowered by law to enter a decree against the United States for damages caused by a vessel under requisition, although employed at the time in war service. Because of this decision, a rehearing was granted, the former decree was vacated, and the final decree was entered on December 13, 1922, upon the agreed damages, holding both vessels at fault. It is from this latter decree that the present appeal is prosecuted.

On the occasion of the collision, it was a clear moonlight night, with a light wind and a smooth sea. The convoy was arranged in nine columns, five vessels in some and four in others. The Nitonian was the second ship in the fifth or middle column, directly astern of the guideship H. M. S. Columbella. The Norman Bridge was the fourth and last vessel in the fourth column from the left. The order of navigation was to have a fore and aft distance of 1,200 feet and a lateral distance between the columns of 2,400 feet, or four cables. The speed order was 9½ knots. At the time of the collision, the convoy was zigzagging, in accordance with a zigzag plan, which provided for a maneuver of two hours' duration, consisting of a starboard and port leg. As arranged, on receiving the signal to begin zigzagging, the vessels simultaneously altered their course 20° to starboard. Ten minutes later the course was altered 20° to starboard. Five minutes later, namely, 15 minutes from the time zigzagging began, the vessels altered their course 40° to the port, thus returning to the true base course, which was held ten minutes. During the next 15 minutes it was arranged that the maneuvers would be the same as during the first 15. At the expiration of 50 minutes, the vessels changed 20° to starboard and held their course 10 minutes, when the first hour would have elapsed. The first hour was referred to as the starboard leg; and the second as the port leg, and consisted of maneuvers just the reverse of those of the first hour, so that at the end of the second hour, the convoy would be again on the base course.

The collision in question occurred after the zigzag clocks indicated 15 minutes past the first zigzag hour. At this time a change of 40° to port was called for under the plan, which would bring the ships back to the base course, N. 81° E. Throughout the evening, the Nitonian was found unable to maintain the prescribed 9½ knots, she claiming it was due to her poor bunker coal. In asserting sole liability against the Norman Bridge, the Nitonian's claim is that about 1 a. m. the Norman Bridge bore three or four points abaft the Nitonian's port beam, distant two to three cables, the vessels then being on a course of 40° starboard of the base course. At about 15 minutes past the first hour of the zigzag, the plan called for change to 40° to port to the base course, N. 81° E., at which time the Nitonian's officer on watch waited until the Columbella had changed her course to port, and then watched the Norman Bridge until she apparently changed to port. Then, concluding that the Norman Bridge was returning to the base course, he ordered the quartermaster to starboard his helm. This was done, and the Nitonian swung to port and steadied on the base course. Shortly after the Nitonian had steadied, the Norman Bridge was observed about a cable away, bearing about two points forward of the port beam and heading across the Nitonian's bow. The Nitonian's engine was stopped, her helm ported, and she sounded one blast. It is said that no change of course was observed on the part of the Norman Bridge, and then the Nitonian's engines were put full speed astern. The Norman Bridge came on, and about one minute later the vessels collided; the Niton-

ian's port bow striking the Norman Bridge's starboard quarter about 20 feet forward of the stern at an angle of about 40°.

The claim of the Norman Bridge was that she was on a course 40° to starboard of the base course, and that the zigzag clock indicated it was time to return to the base course, at which time the Nitonian bore two points forward of the starboard beam, distant about 700 feet. The officer in charge of the watch ordered the quartermaster to "starboard easy." The Norman Bridge had swung around about half way toward the base course, when the Nitonian was discovered about half a length away on the starboard quarter coming toward the Norman Bridge at an angle. While the Norman Bridge was still swinging to port toward the base course, a whistle sounded one short toot. About a minute later, the helm was put hard aport and the helmsman was sent to call the master; the second officer taking the wheel. The helm was put hard aport approximately 30°. The Norman Bridge had ordered her course to starboard about one minute and the collision occurred, the Nitonian's stem striking the Norman Bridge at right angles about 20 feet forward of the stern. The Nitonian was not heading on a base course at the time of the collision, but was three or four points off it.

The Nitonian was a vessel about 400 feet long, while the Norman Bridge was a tanker, 350 feet long. Every vessel in the convoy was required to change courses simultaneously to the heading established by the zigzag plan for the number of minutes after zero indicated on the zigzag clock. Each vessel in the convoy was provided with an electrically operated zigzag clock, which was placed at zero when the guide ship signaled for zigzag to commence. A warning at stated intervals was given when the course was to be changed. If either of the vessels was found at fault in failing to navigate according to this arrangement of sailing, it would constitute evidence of negligence in navigation, and would make the ship so at fault in part or in whole responsible.

It is conceded that the Nitonian found that she was unable to keep the convoy speed, although the cause therefor is not agreed upon. Whatever may be the reason, she dropped back abreast of the vessel which was immediately ahead of the Norman Bridge in the fourth column at about the time the convoy had commenced to zigzag. The Nitonian had abandoned revolutions, and was forcing her engines all she could in order to regain her position, but she slowly lost ground, and about midnight was slightly abaft the rear line. After midnight, four of her twelve fires were cleaned, reducing her steam pressure and resulting in lessening her revolutions to the extent of two or three per minute. She was seen to crowd somewhat on the course of the Norman Bridge and on another vessel, the Los Angeles, which was in a position corresponding to that of the Norman Bridge in the sixth column. This indicated that the Nitonian was attempting to compensate for her speed by cutting down the distance to be covered in a given time while the convoy was zigzagging.

The evidence clearly establishes, as claimed by the Norman Bridge, that shortly before 1 o'clock the convoy was on the leg heading 40° to starboard of the base course, and the next change in heading called for by the zigzag plan was a change of 40° to port of the base course. At the time the Norman Bridge was proceeding on her course, which was likewise 40° to the right of the base course, the next change called for by the zigzag plan was one of 40° to port, about 15 minutes past the hour. The Nitonian, on a parallel course to that of the Norman Bridge, should have been four cables apart, if they were on the same horizontal line. The speed should have been about the same. On such courses as thus navigating, the Norman Bridge would be about one point abaft the Nitonian's beam, and if the Norman Bridge bore four points abaft the port beam of the Nitonian, as her watch officer testified, her bow would have been more than two ship lengths astern. As the Nitonian approached the point where the Norman Bridge turned into her base course, it was apparent that she had miscalculated the point where the Norman Bridge would turn to port on the zigzag. Instead of pointing her helm slightly to run parallel with the Norman Bridge until the convoy made the turn to port, she shut off her engines and coasted for a minute or two, and starboarded her helm to let the Norman Bridge get by, so as to go under her stern. The navigator of the Nitonian admitted that the vessels were on converging courses, and that he took it for granted that the Norman Bridge was then going to swing to her base course, and ordered his quartermaster to starboard his helm.

The Nitonian's story of the collision is unacceptable. Her navigator says he did not swing to port until he thought he saw the Norman Bridge swing to her port. If this was true, the Nitonian was in her proper column, and she would have been four cables to the south of the Norman Bridge, and the collision would not have occurred. The Norman Bridge had straightened on her base course

immediately after the collision, and she was following directly astern of the War Fijian where she belonged.

The Nitonian admits that her helm was put to starboard to pass under the stern of the Norman Bridge, and that her engines were stopped for nearly two minutes to let the Norman Bridge go by. If she had reversed for a short part of this two minutes, there would not have been a collision. Instead of continuing on to her starboard helm, she ported her helm for some reason, and this porting was found by the court below to be the immediate cause of the collision.

The watch officer of the Norman Bridge, observing the last maneuver of the Nitonian, put his helm hard aport to kick his stern away from the Nitonian; but the Nitonian, as a result of this maneuver, could not wholly escape, and her stem struck the starboard quarter of the Norman Bridge, inflicting the damage. The Nitonian then came to a standstill and drifted astern, heading almost at right angles to the course of the convoy. It is clear, from these facts, which we think the evidence justifies, that the two vessels were converging, and that the Nitonian, because she could not keep the speed and did not follow the zigzag course, was crowding upon the course of the Norman Bridge, and came into collision. After crossing the 2,400 feet which separated the fourth and fifth columns, the Nitonian found herself in a position where she remained two minutes in order to attempt to pass under the stern of the Norman Bridge. Instead of being in a position to follow the zigzag clock, as the proper convoy interval permitted, the navigator was obliged to time his swing by that of the Norman Bridge, and then, as he said, "guessed as to the Norman Bridge's swing," so that he might go under her stern. The Nitonian seems to have been under control at this time, and the collision resulted from the navigator's attempt to clear the Norman Bridge by too close a margin. Her engine room log says that her engines were stopped about three minutes before the contact, and it was put astern about one minute before. If, when she stopped, he had reversed, the collision would have been prevented. The New York, 175 U. S. 207, 20 S. Ct. 67, 44 L. Ed. 126; The State of Alabama (D. C.) 17 F. 853.

We find no evidence to warrant a finding that the Norman Bridge did anything to cooperate with the Nitonian's move, as initiated by her, and she may not be held at fault. But it is claimed that the lookout of the Norman Bridge was at fault. Assuming that the several lookouts on the Norman Bridge did not see all they should have, or did not give the warning, as they should have, as to the presence of the Nitonian at or near the Norman Bridge's course, still that of itself would not make the Norman Bridge responsible. The Norman Bridge did all she could do, or all she was called upon to do, to keep her place in the convoy and to follow the directions of the zigzag plan. Having so conducted herself, any inattention on the part of the lookout did not contribute to the bringing about of the collision. The George W. Elder, 249 F. 956, 162 C. C. A. 154; The Fannie, 11 Wall. 238, 20 L. Ed. 114.

The Nitonian is solely at fault for this collision. The decree will be modified, permitting a recovery for the damages sustained by the Norman Bridge, with costs. The libel of the Nitonian will be dismissed, with costs.

Decree modified.

HOUGH, Circuit Judge, dissents, as he agrees with the court below.